**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| CenturyLink Communications, LLC, Level 3 Communications, LLC, Broadwing Communications, LLC, Global Crossing Telecommunications, Inc. and WilTel Communications LLC, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No.    4:18-cv-1006 |
| v. | ) ) | |
| Kansas Fiber Network, LLC and Missouri Network Alliance, LLC, | ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

1.     Plaintiffs CenturyLink Communications, LLC, Level 3 Communications, LLC, Broadwing Communications, LLC, Global Crossing Telecommunications, Inc. and WilTel Communications LLC bring this complaint against Defendants Kansas Fiber Network, LLC and Missouri Network Alliance, LLC for overcharging Plaintiffs millions of dollars for transiting long-distance telephone calls carried by Plaintiffs to or from Defendants' telephone networks.

2.     Under state and federal law, Defendants were required to lower their interstate and intrastate rates to comply with rate caps prescribed by the Federal Communications Commission ("FCC"), the Kansas Corporation Commission, and the Missouri Public Service Commission.  Defendants failed to do so.  As a result, the provisions of their tariffs under which they assessed these charges were void and the charges themselves were unlawful.  Plaintiffs are entitled to recover monies improperly charged and collected from Plaintiffs pursuant to these unlawful tariff provisions.

**Parties**

3.     Plaintiff CenturyLink Communications, LLC ("CenturyLink") is a Delaware limited liability company with its principal place of business in Colorado.  It is a wholly owned subsidiary of CenturyLink, Inc., a publicly traded Louisiana corporation with its principal headquarters in Louisiana.

4.     Plaintiff Level 3 Communications, LLC is a Delaware limited liability company with its principal place of business in Colorado.  Its sole owner and member is CenturyLink.

5.      Broadwing Communications, LLC is a Delaware limited liability company with its principal place of business in Colorado.  Its sole owner and member is Level 3.

6.     Global Crossing Telecommunications, Inc. is a Michigan company with its principal place of business in Colorado.  Its sole owner is Level 3.

7.     WilTel Communications LLC is a Delaware limited liability company with its principal place of business in Colorado.  Its sole owner and member is Level 3.[1]

8.     Defendant Kansas Fiber Network, LLC ("KsFiberNet") is a Kansas limited liability company with its principal place of business in Wichita, Kansas.  KsFiberNet operates a network that runs through Kansas and Missouri, with connections to an on-net data center in Kansas City, Missouri.

9.     Defendant Missouri Network Alliance, LLC ("MNA") is a Missouri limited liability company.  Its principal place of business is in Kansas City, Missouri.

**Jurisdiction and Venue**

10.     This Court has original jurisdiction over the claims in this Complaint for Defendants' violations of the Communications Act, 47 U.S.C. § 151 *et seq.*, pursuant to 28

---

[1] Plaintiffs will refer to Level 3 Communications, LLC, Broadwing Communications, LLC, Global Crossing Telecommunications, Inc. and WilTel Communications LLC collectively as "Level 3."

U.S.C. § 1331 and 47 U.S.C. § 207.

11.     The Court has jurisdiction to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

12.     This Court has original jurisdiction over the remaining claims in this Complaint pursuant to 28 U.S.C. § 1367, because they are so related to the claims brought by Plaintiffs arising from the Communications Act, over which the Court has original jurisdiction, that they form part of the same case or controversy.

13.     The Court has personal jurisdiction over Defendant MNA because its principal place of business is in Missouri and it is therefore subject to this Court's general jurisdiction.

14.     The Court has personal jurisdiction over Defendant KsFiberNet because it owns network, including a tandem switch, in this district, and many of the improperly charged calls traversed the Kansas City, Missouri tandem switch; thus, many of the specific illegal charges occurred in this District thereby making KsFiberNet subject to this Court's specific jurisdiction.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because MNA resides in this District.

16.     Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this Complaint occurred in this district.

**Allegations of Fact**

17.     This case involves a dispute over the rates KsFiberNet and MNA charge CenturyLink and Level 3 for exchanging long-distance telephone calls to or from Defendants' network.  Since at least 2011, Defendants have substantially overcharged Plaintiffs in violation of state and federal law.

*Long-distance Calling on the Public Switched Telephone Network*

18.     Completing long-distance telephone calls requires the coordination of at least two

different types of telecommunications providers: long-distance carriers (also known as inter-exchange carriers, or "IXCs"), and local exchange carriers (known as "LECs"). LECs own the hardware that connects to individual customers in their local area and provide local telephone service to those individual customers. IXCs, by contrast, connect different LECs to each other.

19.     To complete a long-distance telephone call, the LEC serving a calling party in its exchange must route that call onto the network of an IXC, which must then route that call to the LEC that serves the called party.

20.     Plaintiffs CenturyLink and Level 3 are common carriers and operate as both IXCs and LECs. The issues in this Complaint, however, concern only their roles as IXCs in connecting LECs and carrying long-distance telephone traffic.

*Switched Access Charges*

21.     When a LEC either receives a call from or delivers a call to an IXC on behalf of an end-user, it provides what is known as "switched access service."

22.     Since the break-up of AT&T in 1984, IXCs have paid LECs "switched access charges" to provide switched access service. *See Sw. Bell Tel. Co. v. FCC*, 153 F.3d 523, 535, 546 (8th Cir. 1998); *Qwest Commc'ns Co. v. Aventure Commc'ns Technology, LLC*, 86 F. Supp. 3d 933, 941–44 (S.D. Iowa 2015); 47 U.S.C. § 251(g).

23.     The rates, terms, and conditions required for LECs to impose switched access charges on interstate calls must be set forth in "access tariffs" duly filed with the Federal Communications Commission. *See* 47 U.S.C. § 203.

24.      State commissions require the same for intrastate calls. In Missouri, intrastate communications are regulated by the Missouri Public Services Commission ("Missouri PSC"). In Kansas, intrastate communications are regulated by the Utilities Division of the Kansas

Corporation Commission ("KCC"). LECs must file tariffs with these respective commissions in order to assess tariffed charges for intrastate calls made within their respective states.

*The Role of KsFiberNet and MNA in Long-Distance Telephone Calling*

25. IXCs often connect directly to the LECs in order to route traffic to or from the LECs. But in some areas, such as rural areas with comparatively low call volumes, the volumes of traffic do not justify direction connections to each of the LECs that may serve the area. In those cases, to obviate the cost of building these direct connections and to ensure that the IXCs have access to the local exchanges, the LECs issue routing instructions to IXCs to connect to an intermediate carrier, which in turn connects directly to the LECs.

26. KsFiberNet and MNA are common carriers designated by various LECs to serve this intermediate function in the delivery of interstate and intrastate long-distance calls, and as such operate, in part, as tandem switch providers.

27. In connecting the IXCs and LECs, KsFiberNet and MNA provide an element of switched access service known as tandem switching and tandem-switched transport.

28. In providing tandem switching, KsFiberNet and MNA do not deliver calls directly to end users. Instead, IXCs connect to KsFiberNet and MNA, which in turn connect to the participating LECs that service the end users. This reduces the total number of connections that must be made between the LECs and IXCs, avoiding the fixed cost of building each of those direct connections and potentially reducing the cost of routing traffic to or from the LECs in the areas that KsFiberNet and MNA serve.

*Regulations Governing Rates Assessed by LECs*

29. The regulations governing the rates LECs may charge for providing switched access service depends in part on the type of LEC, of which there are two: "incumbent" LECs,

or ILECs, and "competitive" LECs, or CLECs. "ILECs are the traditional providers of local exchange services, while CLECs are new entrants into the market that compete with ILECs." *Connect Insured Tel., Inc. v. Qwest Long Distance, Inc.*, No. 3:10-CV-1897-D, 2012 WL 2995063, at *1 n.1 (N.D. Tex. July 23, 2012).

30.     The FCC regulates the rate levels ILECs may charge for their services, including switched access, by requiring them to comply with rate-of-return or price-cap regulations. *See In Re Access Charge Reform*, 16 FCC Rcd. 9923, 9975 n.93 (2001). The rates charged by ILECs serve as a benchmark for CLECs, which may file tariffs permitting them to assess charges up to the rates assessed by ILECs. *Id.*; *see also* 47 C.F.R. § 61.26. CLECs may charge rates in excess of these benchmarks only if they have a contractual agreement with the IXCs permitting them to charge these above-benchmark rates. *Id.*

31.     Both Missouri and Kansas state law impose similar restrictions. Under Missouri law, "[t]he exchange access rates of an alternative local exchange company"—i.e., a CLEC—"shall not exceed the exchange access rates of the incumbent local exchange company against whom the alternative local exchange company is competing." Mo. Ann. Stat. § 392.370. And in January 2014, the Kansas State Corporation Commission adopted the FCC's CLEC benchmarking rules for intrastate switched access purposes. *See Order Granting Petition for Reconsideration*, Docket No. 13-GIMT-611-GIT (rel. Jan. 14, 2014), Ordering ¶ C.

*FCC Decisions Capping Switched Access Rates*

32.     In 2011, the FCC issued new rules for terminating switched access to transition away from the existing access charge regime and toward a "bill and keep" regime in which carriers would bill their customers, and not one another, for delivering a call.

33.     As one of the first steps in this transition, the FCC capped "all interstate switched

access rates in effect" as of December 29, 2011. *Connect America Fund et al.*, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd. 17663, 17933 ¶ 800 (2011) (the "*USF/ICC Transformation Order*"). The FCC also capped interstate "tariff rates [at] no higher than the default transitional rate"—i.e., the interstate rates effective December 31, 2011. 47 CFR §§ 51.905(b). Over time, the FCC explained, it would lower this cap to zero, using "measured but firm glide paths to provide industry with certainty and sufficient time to adapt to a changed regulatory landscape." *USF/ICC Transformation Order*, 26 FCC Rcd. 17663 ¶ 1.

34.    In addition, to reduce the disparity between interstate rates and intrastate rates (which historically tended to be higher than interstate rates), the FCC issued orders requiring that intrastate and interstate terminating access rates be brought "to parity." *USF/ICC Transformation Order*, 26 FCC Rcd. at 17676–77 ¶ 35.

35.    Specifically, the FCC promulgated rules requiring CLECs to (1) cap their intrastate terminating rates at the values in effect on December 29, 2011; (2) beginning on July 3, 2012, if their intrastate terminating rates were higher than their interstate rates, to decrease their intrastate terminating rates by half the difference between their intrastate and capped interstate rates; and (3) beginning on July 1, 2013, to eliminate the difference altogether, reducing their intrastate terminating rates to be at parity with their interstate rates (which in turn were to be equal to the rates of the competing ILEC under the FCC's benchmark rules). *See* 47 CFR §§ 51.911(a)–(c).

36.    Thus, 47 C.F.R. § 61.26 requires a CLECs originating and terminating interstate access rates to be the same or lower than the equivalent rates assessed by their competing ILECs, and the *USF/ICC Transformation Order* requires the CLEC's terminating access rates—both interstate and intrastate—to be the same or lower than that assessed by their competing ILEC.

7

*Applicability of Rate Cap Rules to KsFiberNet and MNA*

37.     The FCC's rate-cap and rate-parity rules discussed above also apply to KsFiberNet and MNA.

38.     The FCC has expressly held that common carriers that provide elements of switched access service, including tandem switching, are CLECs subject to the FCC's rate-cap and rate-parity rules.  *See AT&T Corp. v. Iowa Network Services, Inc. d/b/a Aureon Network Services*, 32 FCC Rcd. 9677 (2017) ("*Aureon*").

39.     For example, *Aureon* concerned another intermediate carrier which was organized for the express purpose of performing tandem-switching functions like those provided by KsFiberNet and MNA.  That is, the carrier connected IXCs' facilities to a centralized switch and network which, in turn, connected with rural LEC networks at various points of interconnection.

40.     The carrier in *Aureon* assessed charges to IXCs pursuant to its tariff to "recover[ ] the costs of both transport and tandem switching."  *Id.* ¶ 11.  However, the carrier contended that it was not subject to the rate cap and rate parity requirements for various reasons, including that it was not a LEC and that the rules apply only to ILECs and CLECs.

41.     But the FCC disagreed, holding that the carrier was a CLEC under 47 CFR § 51.5 because it "provi[des] . . . exchange access."  32 FCC Rcd. 9677 ¶ 25.  And as a CLEC, the carrier "must comply with the rate cap and rate parity rules," under which "the rates may not exceed the specified cap."  *Id.* ¶ 26.

42.     This was true even though intermediate carriers do not "directly serve end users"; indeed, the FCC acknowledged that "nothing in the *USF/ICC Transformation Order* suggests that the Commission intended to exclude [intermediate carriers] from its scope."  *Id.* ¶ 28.

43.     The FCC also rejected the carrier's contention that its rates were "deemed lawful"

8

when its interstate tariff took effect simply by virtue of the fact that the rates were set forth in its filed tariff: "[T]ariffs still must comply with the applicable statutory and regulatory requirements," and "[t]hose that do not may be declared invalid. Where the Commission, as here, has prohibited the filing of a tariff with rates above the transitional default rate, such a tariff cannot benefit from 'deemed lawful' status." *Id.* ¶ 29 (citations and quotation marks omitted).

44.     Therefore, the intermediate carrier's tariff filing, which imposed interstate rates above the level permitted under the rate cap and rate parity rules and above the rates of the benchmark ILEC, "was unlawful when filed and void *ab initio*." *Id.* ¶ 29; *see also In the Matter of Iowa Network Access Div., Tariff F.C.C. No. 1, 36*, 2018 WL 3641034 ¶¶ 21, 122 (OHMSV July 31, 2018), citing 47 C.F.R. § 61.26(f) ("If a CLEC provides some portion of the switched exchange access services used to send traffic to or from an end user not served by that CLEC, the rate for the access services provided may not exceed the rate charged by the competing ILEC for the same access services. . . .").

### *KsFiberNet's Violations of State and Federal Rate Regulations*

45.     Upon information and belief, Southwestern Bell Telephone Co. d/b/a AT&T Kansas is the ILEC against which KsFiberNet competes in providing tandem switching services, and therefore the ILEC whose rates serves as benchmarks for determining the rates that KsFiberNet can charge.

46.     Thus, in order to be facially compliant with Kansas and FCC regulations, KsFiberNet's tariffs must provide interstate and intrastate rates at least as low as AT&T Kansas's.

47.     KsFiberNet's rates are substantially higher than those assessed by AT&T Kansas's.

9

48.    AT&T Kansas has tariffs on file with the KCC and the FCC.

49.    By July 2013, AT&T Kansas reduced the rates in its intrastate tariffs with the KCC to bring those rates to parity with AT&T Kansas's interstate rates.

50.    KsFiberNet filed an intrastate tariff (KCC No. 1) for the rates in question with the KCC in 2013. It has not been subsequently amended.

51.    KsFiberNet filed an interstate tariff (FCC No. 1) for the rates in question with the FCC in February 2010. It has not been subsequently amended.

52.    Since at least July 2013 and continuing to today, KsFiberNet's interstate tariffs have provided for interstate switched access rates that are higher than the interstate switched access rates charged by AT&T Kansas.

53.    Specifically, KsFiberNet's interstate tariff sets forth rates for "Switched Access Service" which is comprised of rate categories including Switched Transport. As defined in the tariff, "Switch Transport service is comprised of three parts: (1) a usage-based, distance sensitive Switch Facility component applied to the shared interoffice transmission between the end office and the Company switch, (2) a usage-based Switch Termination component applied at the Company end of the measured facility segment, and (3) the Company switching function." KsFiberNet FCC No. 1 § 3.2.2.

54.    The tariffed rate provided in KsFiberNet's interstate tariff for "Tandem Switched Facility" is $0.000139 per minute per mile. KsFiberNet FCC No. 1 § 5.1. By contrast, AT&T Kansas's interstate tariff sets forth rates for tandem switched facility at $0.000003 per minute per mile. Thus, KsFiberNet's rate for the same service is over 46 times higher than AT&T Kansas's.

55.    The tariffed rate provided in KsFiberNet's interstate tariff for "Tandem Switched Termination" is $0.00046 per minute per termination. KsFiberNet FCC No. 1 § 5.1. By

contrast, AT&T Kansas's interstate tariff sets forth rates for tandem switched termination at $0.000053 per minute. Thus, KsFiberNet's rate for the same service is over eight times higher than AT&T Kansas's.

56. The tariffed rate provided in KsFiberNet's interstate tariff for "Tandem Switching" is $0.001624 per minute per tandem. KsFiberNet FCC No. 1 § 5.1. By contrast, AT&T Kansas's interstate tariff sets forth rates for tandem switching at $0.000288 per minute per termination. Thus, KsFiberNet's rate for the same service is over five times higher than AT&T Kansas's.

57. During this time, KsFiberNet has not used AT&T Kansas's rates as a benchmark for its own rates, or reduced its rates for terminating switched access as AT&T Kansas has done, and as KsFiberNet was required to do. This includes, but is not limited to, the fact that KsFiberNet did not match AT&T Kansas's reduction of its interstate terminating rates, despite being required by federal law to do so.

58. Since at least July 2013 and continuing to today, KsFiberNet's intrastate tariffs have also provided for intrastate switched access rates higher than allowed by law.

59. Specifically, KsFiberNet's intrastate tariff sets forth rates for "Switched Access Service" which is comprised of rate categories including Switched Transport. As defined in the tariff, "Switch Transport service is comprised of three parts: (1) a usage-based, distance sensitive Switch Facility component applied to the shared interoffice transmission between the end office and the Company switch, (2) a usage-based Switch Termination component applied at the Company end of the measured facility segment, and (3) the Company switching function." KsFiberNet KCC No. 1 § 3.2.2.

60. The tariffed rate provided in KsFiberNet's intrastate tariff for "Tandem Switched

Transmission/Common Transport" is $0.000206 per minute per mile. KsFiberNet KCC No. 1 § 5.1. By contrast, AT&T Kansas's intrastate tariff sets forth rates for tandem switched facility at $0.000003 per minute per mile. Thus, KsFiberNet's rate for the functionally equivalent service is over 68 times higher than AT&T Kansas's.

61. The tariffed rate provided in KsFiberNet's intrastate tariff for "Tandem Switched Transmission/Common Transport" is $0.00175 per minute per termination. KsFiberNet KCC No. 1 § 5.1. By contrast, AT&T Kansas's intrastate tariff sets forth rates for tandem switched termination at $0.000053 per minute. Thus, KsFiberNet's rate for the functionally equivalent service is over three times higher than AT&T Kansas's.

62. The tariffed rate provided in KsFiberNet's intrastate tariff for "Tandem Switching" is $0.001542 per minute per tandem. KsFiberNet KCC No. 1 § 5.1. By contrast, AT&T Kansas's intrastate tariff sets forth rates for tandem switching at $0.000288 per minute per termination. Thus, KsFiberNet's rate for the same service is over five times higher than AT&T Kansas's.

63. During this time, KsFiberNet has not used AT&T Kansas's rates as a benchmark for its own rates, or reduced its rates along the glide path established by the FCC as AT&T Kansas has done.

64. By July 1, 2012, federal law (as implemented by the 2011 rules) required KsFiberNet to reduce its intrastate rates by 50 percent of the differential between its intrastate rate and its interstate switched access rate, which in turn was required to at least match AT&T Kansas's interstate rate. Thus, by July 1, 2012, KsFiberNet was required by federal law to reduce its intrastate rates to make them at least 50 percent closer to AT&T Kansas's interstate rates. KsFiberNet did not do so, in violation of federal law.

65.     By July 1, 2013, federal law (as implemented by the 2011 rules) required KsFiberNet to bring its intrastate rates into parity with its interstate rates, which in turn were required to at least match AT&T Kansas's interstate rates. Thus, by July 1, 2013, KsFiberNet was required by federal law to bring its intrastate rates into parity with AT&T Kansas's interstate rates. KsFiberNet did not do so, in violation of federal law.

66.     As noted above, in January 2014, the Kansas State Corporation Commission adopted the FCC's CLEC benchmarking rules for intrastate switched access purposes.  Thus, following the January 2014 order, KsFiberNet was required by Kansas law to bring its intrastate rates for both terminating and originating access into parity with AT&T Kansas's interstate rates. It did not do so, in violation of Kansas law.

67.      There is no negotiated contract between KsFiberNet and Plaintiffs for switched access services.

68.     From July 2012 to the present, KsFiberNet has charged Plaintiffs under its tariff rates which have violated state and federal law.

69.     Since July 2012, KsFiberNet has charged Plaintiffs an amount to be proved at trial, but in excess of $1 million more for interstate and intrastate switched access charges under tariffs which did not comply with the law.

70.     Under FCC rules, KsFiberNet's interstate and intrastate tariffs were rendered void once they fell out of compliance with federal law by at least 2012. Because KsFiberNet's tariffs were void as of that date, the entire amount KsFiberNet has charged Plaintiffs since at least July 2012 was improper.

71.     In the alternative, even if KsFiberNet's tariffs are not wholly void, they contain impermissible rates, and Plaintiffs are due a refund in an amount to be proven at trial.

*Plaintiffs' Notices of Dispute to KsFiberNet*

72.     On July 27, 2018, CenturyLink submitted a notice of dispute to KsFiberNet contending that KsFiberNet was billing rates in excess of the FCC's CLEC benchmark rule and the *USF/ICC Transformation Order* and requesting a refund for all past bills inaccurately or improperly rendered.

73.     On July 30, 2018, KsFiberNet denied CenturyLink's request, contending that CenturyLink had purchased tandem switching and transport services based on KsFiberNet's "lawfully tariffed tandem rate elements" and that, "[a]s a competitive tandem provider that does not own any end office switches or provide local exchange services," its tariffs "comply with all applicable federal and state inter-carrier compensation rules."

*MNA's Violations of State and Federal Rate Regulations*

74.     In 2005, the Missouri PSC issued MNA a certificate to provide basic local telecommunications services and switched exchange access service, and approved its intrastate tariff.[2]  The certificate provided terms and conditions that MNA was required to obey in order to provide service.  In order to obtain its certificate, MNA agreed to comply with all applicable PSC rules except those expressly waived.

75.     MNA's certificate expressly requires that MNA's switched access rates be "no greater than the lowest Commission-approved corresponding access rates in effect for each ILEC within whose service area Missouri Network Alliance seeks authority to provide service."

76.     MNA's Missouri certificate expressly requires that "if the directly competing ILEC, in whose service area [MNA] is operating, decreases its originating and/or terminating switched access service rates, [MNA] shall file an appropriate tariff amendment to reduce its

---

[2] *See* https://psc.mo.gov/CMSInternetData/ON/orders/2005/05195353.htm.

originating and/or terminating rates. . . .”

77.     Thus, both Missouri law and FCC rules and regulations require MNA to charge rates no higher than that of the competing ILECs, and subject MNA to the rate-cap and rate-parity rules described above.

78.     MNA's Missouri certificate authorizes it to operate in exchanges served by Southwestern Bell Telephone Company d/b/a AT&T Missouri (“AT&T Missouri”), Sprint Missouri Inc. (which is now Embarq Missouri Inc d/b/a CenturyLink) (“Embarq”), and CenturyTel of Missouri (which is now CenturyTel of Missouri d/b/a CenturyLink) (“CenturyTel”). In other words, AT&T Missouri, Embarq, and CenturyTel are the three ILECs against which MNA competes, and therefore the three ILECs whose rates serve as benchmarks for determining the rates that MNA can charge for services in Missouri.

79.     In order to be facially compliant with FCC regulations, Missouri law and the terms of its Missouri certificate, MNA's tariffs must provide interstate and intrastate rates at or below the competing ILECs.

80.     MNA's rates are significantly higher than all of the ILECs in whose service area MNA competes.

81.     Of the four ILECs that MNA competes with, AT&T Missouri's access charge rates are the lowest. Thus, in order to be facially compliant with FCC regulations, MNA's tariffs must provide interstate and intrastate rates at least as low as AT&T Missouri's.

82.     AT&T Missouri has tariffs on file with the Missouri PSC and the FCC. On July 1, 2011, AT&T Missouri reduced the rates in its interstate tariffs with the FCC. On June 10, 2013, AT&T Missouri reduced the rates in its intrastate tariffs with the Missouri PSC to bring those rates to parity with AT&T's interstate rates.

83.     MNA filed an intrastate tariff (PSC Mo. No. 3) for the rates in question with the Missouri PSC in 2008.  Upon information and belief, it has not been subsequently amended.

84.     MNA filed an interstate tariff (FCC No. 1) for the rates in question with the FCC in October 2008.  It was amended in 2012 but the rates remained unchanged.

85.     Since at least July 2011 and continuing to today, MNA's interstate tariffs have provided for interstate switched access rates that are significantly higher than the interstate switched access rates charged by AT&T Missouri.

86.     Specifically, the composite rate MNA charges for interstate tandem switching and transport is $0.00283 per minute, and the rate charged by AT&T Missouri for similar functionality is $0.000344 per minute.  MNA's rate for the same service is over eight times higher than AT&T's.

87.     During this time, MNA has not used AT&T Missouri's rates as a benchmark for its own rates, or reduced its rates along the glide path toward bill and keep as AT&T Missouri has done, and as MNA was required to do.  This includes, but is not limited to, the fact that MNA did not match AT&T Missouri's July 1, 2011 reduction of its interstate rates, despite being required by federal law to do so.

88.     Similarly, since at least July 2011 and continuing to today, MNA's intrastate tariffs have provided for intrastate switched access rates higher than allowed by law.

89.     Specifically, the composite rate MNA charges for intrastate tandem switching and transport is $0.00758 per minute and the rate charged by AT&T Missouri for similar functionality is $0.000344 per minute.  MNA's rate for the same service is over twenty-two times higher than AT&T Missouri's.

90.     During this time, MNA has not used AT&T Missouri's rates as a benchmark for

16

its own rates, or reduced its rates along the glide path established by the FCC as AT&T Missouri has done.

91.    By July 1, 2012, federal law (as implemented by the 2011 rules) required MNA to reduce its intrastate rates for terminating access by 50 percent of the differential between its intrastate rate and its interstate switched access rate, which in turn was required to at least match AT&T's interstate rate. Thus, by July 1, 2012, MNA was required by federal law to reduce its intrastate rates to make them at least 50 percent closer to AT&T Missouri's interstate rates. MNA did not do so, in violation of state and federal law.

92.    By July 1, 2013, federal law (as implemented by the 2011 rules) required MNA to bring its intrastate rates into parity with its interstate rates, which in turn were required to at least match AT&T Missouri's interstate rates. Thus, by July 1, 2013, MNA was required by federal law to bring its intrastate rates into parity with AT&T Missouri's interstate rates. MNA did not do so, in violation of state and federal law.

93.    There is no negotiated contract between MNA and Plaintiffs for switched access services.

94.    From July 2011 to the present, MNA has charged Plaintiffs under its tariff rates which have violated state and federal law.

95.    Since July 2011, MNA has charged Plaintiffs an amount to be proved at trial, but in excess of $1 million more for interstate and intrastate switched access charges under tariffs which did not comply with the law.

96.    Under FCC rules, MNA's interstate and intrastate tariffs were rendered void once they fell out of compliance with federal law by 2011. Because MNA's tariffs were void as of that date, the entire amount MNA has charged Plaintiffs since July 2011 was improper.

97.     In the alternative, even if MNA's tariffs are not void, they contain impermissible rates, and Plaintiffs are due a refund in an amount to be proven at trial.

*Plaintiffs' Notices of Dispute to Missouri Network Alliance*

98.     On June 20, 2018, Level 3 and CenturyLink submitted a notice of dispute to MNA noting that MNA, being subject to the FCC's CLEC benchmark rule and the *USF/ICC Transformation Order*, was not complying with these requirements and was billing switched access charges in excess of that permitted by applicable law.

99.     On June 26, 2018, MNA denied the dispute, contending that "the FCC ICC reform order is being incorrectly applied to Missouri Network Alliance, LLC."

**COUNT I:  Violation of Section 201(b) of the Communications Act**

*Violation of 47 C.F.R. § 61.26 (Both Defendants)*

100.     Plaintiffs incorporate each of the preceding paragraphs as if fully stated herein.

101.     Under Section 201(b) of the Communications Act, "[a]ll charges, practices, classifications, and regulations for and in connection with [an interstate or foreign] communications service, shall be just and reasonable," and any "charge, [or] practice . . . that is unjust or unreasonable is hereby declared to be unlawful."

102.     47 C.F.R. § 61.26(b) prohibits LECs, such as Defendants, from filing tariffs for interstate switched exchange access service, whether for terminating or originating calls, that are higher than the rate charged for such services by the competing ILEC.

103.     From at least 2011 to the present, Defendants have billed Plaintiffs interstate access charges at rates in excess of that permitted by 47 U.S.C. § 61.26.

104.     Defendants' FCC tariffs improperly set out rates that exceeded those charged by the relevant ILEC in violation of federal law.

105.     Pursuant to FCC rules, these provisions were unlawful once they were out of

compliance with instructions to reduce rates in conformance with the FCC's rate-cap and rate-parity rules, and were therefore void.

106.    The assessment of charges by a common carrier pursuant to unlawful tariff provisions is by definition unjust and unreasonable.

107.    Defendants assessed charges to Plaintiffs pursuant to these unlawful provisions of their tariffs.

108.    These charges, being assessed pursuant to unlawful tariff provisions that were void, are unjust and unreasonable.

109.    Notwithstanding Plaintiffs' notices of dispute seeking refunds of these improper charges, Defendants have failed to remit credits in the amounts compensating Plaintiffs for the improperly billed charges.

110.    As a direct and proximate result of Defendants' violations of the FCC rules and Sections 201(b) of the Communications Act, Plaintiffs have suffered damages and loss, and are entitled to damages in an amount to be determined at trial but no less than $75,000 for unlawful charges they have paid Defendants, along with interest and reasonable costs and attorneys' fees pursuant to 47 U.S.C. § 206.

**COUNT II:  Violation of Section 201(b) of the Communications Act**

*Violation of USF/ICC Transformation Order (Both Defendants)*

111.    Plaintiffs incorporate each of the preceding paragraphs as if fully stated herein.

112.    Under Section 201(b) of the Communications Act, "[a]ll charges, practices, classifications, and regulations for and in connection with [an interstate or foreign] communications service, shall be just and reasonable," and any "charge, [or] practice . . . that is unjust or unreasonable is hereby declared to be unlawful."

113.    The *USF/ICC Transformation Order* requires LECs to reduce their tariffed

19

interstate and intrastate rates for terminating traffic so they are equal to the rates assessed by the ILEC with which they compete.

114.    Since the issuance of the *USF/ICC Transformation Order*, KsFiberNet and MNA have billed Plaintiffs for interstate and intrastate terminating switched access charges under their state-commission and FCC tariffs at excessive at rates in violation of the *USF/ICC Transformation Order*.

115.    Defendants' state and FCC tariffs failed to comply with rules and regulations, including but not necessarily limited to the CLEC benchmark rule and rate-cap rules, limiting their terminating switched access rates to those assessed by the relevant ILEC.

116.    Defendants' state and FCC tariffs improperly set out rates that exceeded those charged by the relevant ILEC in violation of state and federal law.

117.    Pursuant to FCC rules, these provisions were unlawful once they were out of compliance with instructions to reduce rates in conformance with the FCC's rate-cap and rate-parity rules, and were therefore void.

118.    The assessment of charges by a common carrier pursuant to unlawful tariff provisions is by definition unjust and unreasonable.

119.    Defendants assessed charges to Plaintiffs pursuant to these unlawful provisions of their tariffs.

120.    These charges, being assessed pursuant to unlawful tariff provisions that were void, are unjust and unreasonable.

121.    Notwithstanding Plaintiffs' notices of dispute seeking refunds of these improper charges, Defendants have failed to remit credits in the amounts compensating Plaintiffs for the improperly billed charges.

122.     As a direct and proximate result of Defendants' violations of the FCC rules and Sections 201(b) of the Communications Act, Plaintiffs have suffered damages and loss, and are entitled to damages in an amount to be determined at trial but no less than $75,000 for unlawful charges they have paid MNA, along with interest and reasonable costs and attorneys' fees pursuant to 47 U.S.C. § 206.

## COUNT III:  Breach of Contract

### *Violation of Tariffs (KsFiberNet)*

123.     Plaintiffs incorporate each of the preceding paragraphs as if fully stated herein.

124.     KsFiberNet's Kansas and interstate and intrastate tariffs constitute contracts between KsFiberNet and any purchasers of services from those tariffs, which includes Plaintiffs.

125.     KsFiberNet was, and is, in breach of its tariffs by billing Plaintiffs charges pursuant to tariff provisions in excess of the rate-cap and rate-parity rules promulgated by the FCC and KCC and that were thus void as a matter of law.

126.     As a direct and proximate result of KsFiberNet's conduct as alleged above, Plaintiffs have been damaged in an amount to be determined at trial and are entitled are entitled to compensation for all amounts for which they have not received proper credits, plus interest.

## COUNT IV:  Breach of Contract

### *Violation of Tariffs (MNA)*

127.     Plaintiffs incorporate each of the preceding paragraphs as if fully stated herein.

128.     MNA's Missouri and interstate and intrastate tariffs constitute contracts between MNA and any purchasers of services from those tariffs, which includes Plaintiffs.

129.     MNA was, and is, in breach of its tariffs by billing Plaintiffs charges pursuant to tariff provisions in excess of the rate-cap and rate-parity rules promulgated by the FCC and Missouri Commission and that were thus void as a matter of law.

130.     As a direct and proximate result of MNA's conduct as alleged above, Plaintiffs have been damaged in an amount to be determined at trial and are entitled to compensation for all amounts for which they have not received proper credits, plus interest.

### COUNT V:  Breach of Contract

*Violation of Missouri Certificate (MNA)*

131.     Plaintiffs incorporate each of the preceding paragraphs as if fully stated herein.

132.     The certificate issued to MNA by the Missouri PCS constitutes a contract between MNA and any purchasers of services from MNA, which includes Plaintiffs.

133.     MNA was, and is, in breach of its certificate by billing Plaintiffs charges that were greater than the lowest Commission-approved corresponding access rates in effect for the ILEC within whose service area MNA provided service and by failing to file appropriate tariff amendments to reduce its originating and/or terminating rates.

134.     As a direct and proximate result of MNA's conduct as alleged above, Plaintiffs have been damaged in an amount to be determined at trial and are entitled to compensation for all amounts for which they have not received proper credits, plus interest.

### Count VI:  Money Had and Received

*(Both Defendants)*

135.     Plaintiffs incorporate each of the preceding paragraphs as if fully stated herein.

136.     Since at least 2011 through the present, Defendants have failed to comply with state and federal law requiring them to lower intrastate and interstate rates to those of the applicable ILEC.

137.     Since at least 2011, Defendants have improperly charged Plaintiffs more than they were entitled to charge by an amount to be proved at trial, but not less than $75,000, under unlawful interstate and intrastate tariffs.

138. Defendants received or obtained possession of Plaintiffs' money when Plaintiffs paid Defendants improper charges under their interstate and intrastate tariffs.

139. By receiving Plaintiffs' money, Defendants appreciated a benefit.

140. Defendants' acceptance and receipt of Plaintiffs' money was unjust.

141. Equity and good conscience call for Defendants to return Plaintiffs' money to Plaintiffs.

142. Plaintiffs are entitled to recover money Defendants has improperly charged them.

<b>Count VII: Unjust Enrichment</b>

<i>(Both Defendants)</i>

143. Plaintiffs incorporate each of the preceding paragraphs as if fully stated herein.

144. From 2011 through the present, Defendants have failed to comply with state and federal law requiring them to lower their intrastate rates and benchmark their interstate and intrastate rates to those of the applicable ILEC.

145. Since at least 2011, Defendants have improperly charged Plaintiffs more than they were entitled to by an amount to be proven at trial but not less than $75,000 under unlawful interstate and intrastate tariffs.

146. Plaintiffs conferred a benefit on Defendants by paying those illegal charges.

147. Defendants appreciated the fact of the benefit they received from Plaintiffs.

148. Acceptance and retention by Defendants of the benefits of Plaintiffs' overpayments would be inequitable.

149. Plaintiffs are entitled to recover the money Defendants have improperly charged.

<b>COUNT VIII: Declaratory Relief</b>

150. Plaintiffs incorporate each of the preceding paragraphs as if fully stated herein.

151. Defendants' continuing assessment of originating and terminating access charges

pursuant to unlawful provisions of their interstate tariffs violates 47 C.F.R. § 61.26, which requires a common carrier to bill for interstate tariffed services at or below the rates of the competing ILEC.

152.    Defendants' continuing assessment of terminating access charges pursuant to unlawful provisions of their interstate and intrastate tariffs also violates 47 U.S.C. § 201(b), which requires a carrier's charges to be just and reasonable and in conformance with FCC rules including but not limited to the *USF/ICC Transformation Order*.

153.    KsFiberNet's continuing assessment of originating and terminating access charges pursuant to unlawful provisions of its intrastate tariff also violates the orders of the KCC, which has adopted the FCC's CLEC benchmarking rules for intrastate switched access purposes (*see Order Granting Petition for Reconsideration*, Docket No. 13-GIMT-611-GIT (rel. Jan. 14,2014), Ordering ¶ C).

154.    MNA's continuing assessment of originating and terminating access charges pursuant to unlawful provisions of its intrastate tariffs also violates Missouri statute, which requires that access rates of CLECs "shall not exceed the exchange access rates of the incumbent local exchange company against whom the alternative local exchange company is competing." Mo. Ann. Stat. § 392.370.

155.    MNA's continuing assessment of originating and terminating access charges pursuant to unlawful provisions of its intrastate tariffs also violates their Missouri certificate, which requires that MNA set tariff rates at or below that being charged by competing ILECs.

156.    An actual and substantial controversy exists between the parties as to whether Defendants are entitled under the FCC's rules and federal law to assess charges pursuant to these unlawful provisions of its interstate and intrastate tariffs.

157.    An actual and substantial controversy exists between the parties as to whether MNA is entitled under Missouri law and its Missouri certificate to assess charges pursuant to these unlawful provisions of its intrastate tariff.

158.    An actual and substantial controversy exists between the parties as to whether KsFiberNet is entitled under Kansas law to assess charges pursuant to these unlawful provisions of its intrastate tariff.

159.    The controversy concerns the legitimacy of charges presently being assessed by Defendants each month, and thus presents a real and immediate dispute and a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

160.    Plaintiffs are entitled to judgment under 28 U.S.C. § 2201(a) declaring that:

    a.  Defendants' assessment of originating and terminating switched access charges pursuant to their interstate tariffs at rates above those assessed by the ILECs with which they compete violate 47 C.F.R. § 61.26;

    b.  Defendants' assessment of switched access charges pursuant to their interstate and intrastate tariffs on terminating traffic at rates above those assessed by the ILECs with which they compete violates FCC rules, including but not limited to the *USF/ICC Transformation Order*;

    c.  Defendants' interstate and intrastate tariff rates for switched access charges are invalid and void;

    d.  Defendants' assessment of switched access rates pursuant to the invalid rates in their interstate and intrastate tariffs constitute breaches of the tariffs;

<ol type="a" start="5">
<li>MNA's assessment of switched access rates pursuant to its intrastate tariff violates the conditions of its certificate;</li>
<li>Defendants are prohibited from billing Plaintiffs at the rates currently set forth in their tariffs; and</li>
<li>Plaintiffs are entitled to a refund of the amounts they have overpaid Defendants.</li>
</ol>

### PRAYER FOR RELIEF

161.   WHEREFORE, Plaintiffs CenturyLink and Level 3 respectfully request that the Court enter judgment in their favor and against Defendants Kansas Fiber Network and Missouri Network Alliance as follows:

<ol type="a">
<li>Ordering Defendants to pay Plaintiffs damages for their violation of the Communications Act and the breach of their tariffs;</li>
<li>Entering a declaratory judgment as set forth in Count VIII above;</li>
<li>Ordering defendants to pay Plaintiffs' reasonable attorneys' fees and costs; and</li>
<li>All other relief the Court may deem just and necessary.</li>
</ol>

Dated:  December 21, 2018.

Respectfully submitted,

/s/ *Karrie. J. Clinkinbeard*
Karrie J. Clinkinbeard    MO #51413
Matthew R. Brunkhorst MO#64753
ARMSTRONG TEASDALE LLP
2345 Grand Blvd. Suite 1500
Kansas City, MO 64108
Telephone:    (816) 221-3420
Fax:             (816) 221-0786
kclinkinbeard@armstrongteasdale.com
mbrunkhorst@armstrongteasdale.com

Charles W. Steese
(*Pro hac vice* application pending)
Douglas N. Marsh
(*Pro hac vice* application pending)
4643 South Ulster Street Suite 800
Denver, Colorado 80237
Telephone:    (720) 200-0676
Fax:             (720) 200-0679
csteese@armstrongteasdale.com
dmarsh@armstrongteasdale.com

Attorneys for Plaintiffs